JOHN R. SCHWANBECK *vs.* FEDERAL-MOGUL CORPORATION
                        & another.[1]

No. 89-P-1253.

Suffolk. May 15, 1991. - September 23, 1991.

Present: KASS, SMITH, & IRELAND, JJ.

Further appellate review granted, 411 Mass. 1103 (1991).

*Contract,* What constitutes, Offer and acceptance, Damages. *Fraud. Un-
lawful Interference. Consumer Protection Act,* Businessman's claim,
Damages. *Damages,* Consumer protection case, Loss of profits. *Words,*
"Good faith."

In the context of negotiations between a prospective buyer and the seller of
the assets of a business, language in a letter of intent subscribed by the
parties, expressing an intention "to proceed in good faith in the negotia-
tion of [a] binding definitive agreement," stood independent of other
language in the letter disclaiming binding effect, and meant that
neither party had entered into the letter of intent for an ulterior pur-
pose [396-398]; however, the obligation to negotiate in good faith did
not preclude the parties from breaking off negotiations altogether nor
did it require the prospective seller to deal on a precisely parallel basis
with two competing buyers [398-405].
In an action by a prospective buyer, arising out of failed negotiations be-
tween himself and the seller of the assets of a business, the judge's war-
ranted findings, considered in light of applicable legal standards, estab-
lished that the seller had satisfied its obligation to negotiate in good
faith, pursuant to a letter of intent subscribed by the parties. [398-405]
A draft agreement for purchase and sale of the assets of a business, ini-
tialled by attorneys for the seller and the buyer, but leaving unstated
the purchase price and other significant financial terms, did not consti-
tute an "enforceable offer" for purposes of a right of first refusal held
by a different prospective buyer, with whom the seller had been negoti-
ating previously. [406-409]
Where an extended course of negotiations between the buyer and the seller
of business assets matured into a firm offer only after the expiration of
a right of first refusal held by a different prospective buyer, the seller's
misrepresentations to that party of the terms of the offer were not ac-
tionable. [409-410]
In an action against the seller of the assets of a business, evidence of the
seller's statements of the value of the assets, made in the course of

_____

[1]Vellumoid Corporation.

failed negotiations with the plaintiff, a would-be purchaser, did not support a finding of fraud. [410-411]

In an action against the seller of the assets of a business, a finding of fraud was properly based on the seller's misrepresentations in negotiations with the plaintiff, a prospective buyer, that it would not disclose certain appraisals obtained by the plaintiff [411], and that, as of a certain time, there were no other parties competing to purchase the assets [412].

At the jury-waived trial of a fraud claim by a prospective buyer against the seller of the assets of a business, the record did not support a finding that the defendant had dissembled about its true intentions in dealing with the plaintiff. [411]

At the trial of a civil action, the facts as found by the judge did not support a ruling that a defendant, a business competitor of the plaintiff which had not been shown to have any ulterior motive or desire to harm him, was chargeable with tortious interference with an advantageous business relationship between the plaintiff and a corporation with which he was negotiating to purchase the assets of a business. [412-413]

At the trial of claims under G. L. c. 93A, the Consumer Protection Act, brought by a would-be purchaser of the assets of a business, the facts as found by the judge did not warrant a finding of unfair or deceptive acts either by the seller or by a corporation formed by the buyer to operate the business [413-415]; however, the seller was liable for the plaintiff's losses resulting from misrepresentations made during the failed negotiations for the sale [415-416].

Discussion of the appropriate measure of damages where a party is liable for failure of negotiations to form a contract. [416-417]

CIVIL ACTION commenced in the Superior Court Department on September 2, 1981.

The case was heard by *Cortland A. Mathers*, J.

*Michael P. Angelini* (*Vincent F. O'Rourke, Jr., & Barry A. Bachrach* with him) for Vellumoid Corporation.

*Samuel Adams* (*Ralph T. Lepore, III*, with him) for Federal-Mogul Corporation.

*Donald N. Sweeney* (*George P. Field & Edgar J. Bellefontaine* with him) for the plaintiff.

KASS, J. Even by the exuberant standards of the 1980's, the final judgment of $32,516,368.60 (entered on July 10, 1989) from which the defendants appeal was sizeable. What spawned the controversy was a failed effort by the plaintiff Schwanbeck to buy the assets of a division of the codefendant Federal-Mogul Corporation (F-M), and the ultimate sale

of those assets by F-M to other buyers, who organized a new corporation, Vellumoid, Inc.[2] Disappointed and aggrieved, Schwanbeck brought an action which was tried before a judge of the Superior Court sitting without a jury and obtained a judgment based, against F-M, on theories of breach of contract, misrepresentation, and unfair and deceptive practices (G. L. c. 93A, § 11) and, against Vellumoid, Inc., on theories of wrongful interference with contractual relations, wrongful interference with advantageous business relations, and unfair and deceptive practices.

In 1980 Schwanbeck formed an investment banking and financial counselling firm, Harbor Financial Company.[3] During the twelve years since he had taken a degree from the Harvard Business School, Schwanbeck had acquired experience as a securities analyst, stockbroker, and venture capitalist. Through Harbor Financial Company, Schwanbeck began to scout prospects for acquisition. He became interested in F-M's Vellumoid business, and, after an initial disavowal of inclination to sell by F-M, in the late summer and early autumn of 1980, Schwanbeck and F-M began to talk. Their discussions led to the preparation (by F-M) and signing of a letter of intent dated October 31, 1980, a document peculiarly schizophrenic in expression.[4] Its meaning, purpose, and

[2]The assets in which Schwanbeck was interested were real and personal property located in Worcester and used in connection with the Vellumoid division of F-M. Vellumoid was a business name of some lineage in Worcester. Its origins were with vellum-like paper impregnated with a solution of animal glue and treated with formaldehyde. That product was marketed as a wrapping for food around the turn of the last century. In time, the Vellumoid Paper Company began making gaskets and gasket materials, particularly for automobile and aircraft engines. F-M bought the Vellumoid business in 1965.

[3]We take our facts largely from the extensive findings of fact made by the trial judge. Those findings, we accept, unless clearly erroneous. Mass.R.Civ.P. 52 (a); 365 Mass. 816 (1974). *First Pa. Mortgage Trust* v. *Dorchester Sav. Bank.*, 395 Mass. 614, 621-622 (1985).

[4]The letter was on the letterhead of F-M, signed on its behalf by Robert Hague, addressed to Schwanbeck, and signed on November 3, 1980, by Schwanbeck under a sentence that reads:. "The foregoing correctly reflects my understanding to date."

scope are central to the case, and, as a first order of business, we must focus on that letter.

In its introductory paragraph, the letter of October 31, 1980, which runs fourteen single-spaced typewritten pages, expresses the "interest" of F-M in selling the assets of its Vellumoid division and the "interest" of Schwanbeck in buying them. The same paragraph goes on to state that the letter will express such terms and conditions as have been agreed to concerning the transaction. The very next paragraph is a strongly-worded disclaimer that neither party intends to be legally bound by the letter:

> "Of course, this letter is not intended to create, nor do you or we presently have any binding legal obligation whatever in any way relating to such sale and purchase other than (i) with respect to the cost of appraisers and the review of OSHA compliance and repairs to remedy flooding referred to below under the caption 'COSTS AND EXPENSES RELATING TO THE SALE AND PURCHASE' and (ii) those arising from the Confidentiality Agreement referred to in the paragraph following this paragraph. No further obligation will arise until a definitive agreement is reduced to writing and executed by you, the New Corporation and us and then only to the extent provided for and subject to the terms and conditions (e.g., approval of our Board of Directors) which may be set forth therein."

Here is the sort of express limiting provision which we described in *Goren* v. *Royal Investments, Inc.*, 25 Mass. App. Ct. 137, 142-143 (1987), as affording a safe harbor to parties who do not wish to be bound by a preliminary document. If "[p]arties to what would otherwise be a bargain and a contract . . . agree that their legal relations are not to be affected [,][i]n the absence of any invalidating cause, such a term is respected by the law like any other term. . . ." Restatement (Second) of Contracts § 21 comment b (1979). See also, *Bates* v. *Southgate*, 308 Mass. 170, 172 (1941);

*Salem Laundry Co.* v. *New England Teamsters & Trucking Indus. Pension Fund*, 829 F.2d 278, 281 (1st Cir. 1987).

With the very next sentence (which began the third paragraph), the parties manifested uncertainty whether they were merely hugging or engaged to be married.[5] "However," that sentence portentously began:

> "it is our intention, and, we understand, your intention immediately to proceed in good faith in the negotiation of such a binding definitive agreement."

To the degree this cordial language smoothed the hard edge of the "this is not yet a binding deal" language that had preceded it, the letter soon (on the second page) reverts to a "keep-your-hands-on-your-wallet" tone:

> "It has been agreed that we [F-M] are under no moral or legal obligation to refrain from negotiating the sale of the Vellumoid business with others until the definitive agreement has been executed."

Immediately, there follows a qualification, albeit not an inconsistent one:

> "However, should any firm offer to purchase such business be made to us by a third party before December 1, 1980, you will have a right of first refusal to purchase such business on the same terms and conditions contained in such offer. Such right shall be exercisable by you by delivery to us of written notice of such exercise on or before the 15th day following our delivery to you of a writing setting forth such terms and conditions."

Although it covered many business points, the letter of intent by its express terms did not obligate F-M to sell the

---

[5]"There is commercial utility to allowing persons to hug before they marry." *Goren* v. *Royal Investments, Inc.*, 25 Mass. App. Ct. at 142. This apt metaphor was invented in 1987 by Mr. Elliot M. Surkin during the course of a Massachusetts Continuing Legal Education program about real estate practice.

Vellumoid assets, nor did it obligate Schwanbeck to buy them. If the trial judge, when he made the ultimate finding that, "The LOI [letter of intent] is a contract," thought otherwise, he was in error. Generally, the purpose of a letter of intent is not to bind the parties; rather, it is to establish a framework for negotiating further details. See *Mendel Kern, Inc.* v. *Workshop, Inc.*, 400 Mass. 277, 279-281 (1987); *Tull* v. *Mister Donut Dev. Corp.*, 7 Mass. App. Ct. 626, 632 (1979). See also, as a sampling of cases dealing with preliminary documents (with less express limiting language than is contained in the letter of intent in this case) held to be memoranda of imperfect negotiations, *Geo. W. Wilcox, Inc.* v. *Shell E. Petroleum Prod., Inc.*, 283 Mass. 383, 390 (1933); *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 216 (1935); *Blair* v. *Cifrino*, 355 Mass. 706, 709 (1969); *JRY Corp.* v. *LeRoux*, 18 Mass. App. Ct. 153, 172 (1984); *Pappas Indus. Parks, Inc.* v. *Psarros*, 24 Mass. App. Ct. 596, 599 (1987); *Gel Sys.* v. *Hyundai Engr. & Constr. Co.*, 902 F.2d 1024, 1027-1028 (1st Cir. 1990).

Purchase of a substantial business (the Vellumoid division had gross sales in 1979 of $9,328,000) involves questions such as financing, valuation, inventory analysis, allocation of risk for products in the stream of commerce, warranties, pension rights, and labor contracts. Reaching a definitive, binding agreement soaks up time, effort, and intimidating professional fees. When they memorialize key elements of a deal, parties may be in a position to decide that enough is agreed upon to risk the substantial resources which will be consumed in contract formation. The letter of intent focuses attention; it has certain moral force in pressing parties to proceed toward a conclusion of the transaction on the terms outlined; and it assists in obtaining loan financing and capital investment in that the proposed transaction has progressed beyond "just talk." See *Feldman* v. *Allegheny Intl., Inc.*, 850 F.2d 1217, 1220-1221 (7th Cir. 1988); Lake & Draetta, Letters of Intent and Other Precontractual Documents 11-16 (1989).

1. *The obligation to negotiate in good faith.* Whether the expression of intention "to proceed in good faith in the negotiation of [a] binding definitive agreement" constituted a contractual obligation independent of the sweeping disclaimer is a more subtle question. The disclaimer of binding effect referred to "this letter," i.e., all of it, and excepted from the disclaimer only the obligations concerning procuring appraisals and adhering to the confidentiality agreement. F-M urges that the letter be read literally, especially in light of the specific identification of the two exceptions to the disclaimer. If the disclaimer is expressly limited as to those two exceptions, does it not follow that the disclaimer applies to all else set out in the document? Yet some meaning should be ascribed to the word "however" which introduces the "negotiate in good faith" sentence immediately after the disclaimer paragraph, especially if we take into account the canon of interpretation that ambiguities in documents ought to be resolved against the party which drafted it — in this case that party was F-M. *Merrimack Valley Natl. Bank* v. *Baird*, 372 Mass. 721, 724 (1977). We conclude that the intention "to proceed in good faith" provision stands independent of the general disclaimer of binding effect in the letter of intent.

In the absence of an express undertaking to "negotiate in good faith," courts have been reluctant to impose a common law duty so to do. Farnsworth, Contracts § 3.26 (1982).[6] See *Channel Home Centers* v. *Grossman*, 795 F.2d 291, 294, 299 (3d Cir. 1986), in which the words, "you . . . will withdraw the [s]tore from the rental market, and only negotiate the above described leasing transaction to completion," were read as undertaking to negotiate in good faith. See also *Itek*

---

[6]A duty of good faith and fair dealing is implicit in the performance of a contract, even if not stated. *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 102-103 (1977). See *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 712-713 (1990). Restatement (Second) of Contracts § 205 (1979). That principle presupposes the formation of a contract under which the parties are to perform their obligations in good faith, in contrast to the far more inchoate status of parties in the courtship dance phase of contract formation.

*Corp.* v. *Chicago Aerial Indus.*, 248 A.2d 625, 627 (Del. 1968).

Even when, from some combination of words in the preliminary agreement, an undertaking to negotiate in good faith is implied, some courts have had difficulty making anything at all of "negotiating in good faith" clauses in cases involving the *formation* of commercial contracts and have declined to give them effect on the ground of vagueness. One such case is *Candid Productions, Inc.* v. *International Skating Union*, 530 F. Supp. 1330 (S.D.N.Y. 1982), a controversy resembling that before us. Candid Productions, Inc. (Candid) was negotiating for exclusive television rights to ice skating championship competitions sponsored by the International Skating Union (ISU). The parties had undertaken to negotiate in good faith, but, while their discussions were pending, ISU entered into a contract with Columbia Broadcasting Systems (CBS). Candid charged that ISU had acted in bad faith by talking with CBS prior to running out the string with Candid and by failing to disclose to Candid the proposals which CBS was making so that Candid might meet or top them.

Assuming (for purposes of ruling on a motion for summary judgment) bad faith on the part of ISU, the court held that an agreement to negotiate terms in good faith was too vague to be enforceable. *Id.* at 1335-1337. "An agreement to negotiate in good faith is amorphous and nebulous, since it implicates so many factors that are themselves indefinite and uncertain that the intent of the parties can only be fathomed by conjecture and surmise." *Id.* at 1337. "Here the void is too great, the omissions are too noticeable and the risk of ensnaring a party in a set of contractual obligations that he never knowingly assumed is too serious." *Ginsberg Machine Co.* v. *J. & H. Label Processing Corp.*, 341 F.2d 825, 828 (2d Cir. 1965). See also *Bell* v. *B.F. Goodrich Co.*, 359 Mass. 763 (1971); *Necchi* v. *Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693, 698 (2d Cir. 1965), cert. denied, 383 U.S. 909 (1966); *Ohio Calculating, Inc.* v. *CPT Corp.*, 846 F.2d 497, 501-502 (8th Cir. 1988); *Feldman* v. *Allegheny Intl., Inc.*,

850 F.2d at 1223-1224. Compare *Arcadian Phosphates, Inc.*
v. *Arcadian Corp.*, 884 F.2d 69, 71-73 (2d Cir. 1989);
*Teachers Ins. & Annuity Assn. of America* v. *Tribune Co.*,
670 F. Supp. 491, 497-498 (S.D.N.Y. 1987); 1 Corbin,
Contracts § 95 (1963, Supp. 1991).

Even if given legal effect to some extent, we are of opinion
that, in the context of a proposed business acquisition, as to
which the parties have agreed *not* to be bound by their pre-
liminary agreement, and the seller has reserved the right to
deal with other buyers, the obligation to proceed in good
faith means something less than unremitting efforts to get to
"yes," with the players at all times playing their cards face
up. Rather, the obligation means that the preliminary agree-
ment has not been entered into for some ulterior purpose,
such as to set up the proposed buyer from the outset as a
stalking horse for another buyer, or to satisfy a creditor that
steps to transform an asset into cash are actually under way.

A party's genuine motive to deal may be taken as estab-
lished if, following the preliminary agreement, that party
takes some action, such as an exchange of drafts which flesh
out details of the business points agreed to in the preliminary
document. A party may, consistent with good faith dealing,
break off negotiations. Even advocates of heightened stan-
dards of good faith in negotiating have stressed that "parties
must be free to break off preliminary negotiations without
being held to an accounting." Kessler & Fine, *Culpa in Con-
trahendo*, Bargaining in Good Faith, and Freedom of Con-
tract: A Comparative Study, 77 Harv.L.Rev. 401, 412
(1964). Contrast *Teachers Ins. & Annuity Assn. of America*
v. *Tribune Co.*, 670 F. Supp. at 498. This view most con-
forms with the real expectations of persons involved in com-
plex business agreements who, certainly so long as there are
significant issues still to be resolved, think themselves free to
withdraw until the document towards which they are negoti-
ating is signed and delivered. *International Telemeter Corp.*
v. *Teleprompter Corp.*, 592 F.2d 49, 58 (2d Cir.
1979)(Friendly, J., concurring). Not allowing reasonable
freedom to terminate negotiations injects an undesirable x-

factor into preliminary negotiations, which plants the seed of protracted litigation in every deal that goes sour. See *Pappas Indus. Parks* v. *Psarros*, 24 Mass. App. Ct. at 600.

To consider how the principles we have discussed apply to the case before us, we return to the facts found by the trial judge (with occasional supplements of information from the record). Under the letter of intent, the purchase price of the Vellumoid assets, stated in formula terms, worked out to book value plus $25,000, resulting in over-all dollars somewhat in excess of $2,000,000. F-M would finance $1,000,000 of the purchase price by accepting the buyer's note for that amount, and that note was to be secured by a first lien on the realty and personalty, i.e., all the assets, of the corporation Schwanbeck proposed to form to operate the business. Schwanbeck, through his preliminary investigation of the business, had concluded that its assets were worth less than described by F-M's principal negotiator, Joseph Markus. He remonstrated to Markus that granting F-M a 100% first security interest would make it exceedingly difficult to find bank financing for the balance of the purchase price and for working capital. Markus said "they would work it out." The trial judge found that, in reliance on that remark, Schwanbeck signed the October 31, 1980, letter of intent, which *did* expressly require that F-M receive a 100% security interest in the real and personal assets of Schwanbeck's to-be-formed corporation. To the extent the judge thought the expression by Markus that things would be worked out alters the subsequently executed written document, i.e., the letter of intent, he erred. Schwanbeck, a sophisticated businessman, could not reasonably rely on so vague a statement of hope, even if there were no parol evidence rule. See generally Liacos, Massachusetts Evidence 385-387 (5th ed. 1981); *Turner* v. *Johnson & Johnson*, 809 F.2d 90, 96 (1st Cir. 1986). Contrast *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 707-713 (1990); *Sheehy* v. *Lipton Indus., Inc.*, 24 Mass. App. Ct. 188, 193-194 (1987).[7]

---

[7]The opinion in *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, makes the point that, irrespective of sophistication, a businessman is entitled to as-

As previously alluded to, the letter of intent provided that Schwanbeck would obtain independent appraisals of the assets of the Vellumoid division. The parties were to split the cost, subject to a ceiling of $3,500 as to F-M's contribution. Schwanbeck's new corporation was to "make such appraisals available to [F-M] for its use." Although that use is unrestricted by the language of the letter of intent, the judge made a finding that Markus, before the letter of intent was signed, had assured Schwanbeck the appraisals would not be furnished to other buyers and that Schwanbeck had relied on that representation. On the basis of the record,[8] which discloses that Schwanbeck and his lawyer carefully reviewed and revised drafts of the letter of intent prior to the writing of the final draft which Schwanbeck signed, we think this an astonishing finding. There is, however, some record support for the finding and we, therefore, accept it. As will appear, the finding of an undertaking by F-M to hold the appraisals confidential is of comparatively minor consequence.

From November 17 to 19 of 1980, Schwanbeck met in Southfield, Michigan (F-M's home office), with F-M's treasurer, Larry Edwards, with Markus, and with a member of the house counsel staff. They discussed, among other things,

---

sume that deceit is not at work. The *McEvoy* case involved an express representation that a contractual relationship already formed would be long term. On the basis of that representation, the plaintiff made several costly changes of position. Subsequent to contract formation, the defendant presented a document purporting to memorialize the contract already formed, except that it contained a sixty-day termination clause. In response to the plaintiff's nervous inquiry, the defendant said not to worry, the termination clause was a meaningless formality and that the defendant was in for the long haul. The parties had long done business together and the defendant had solicited the plaintiff's long term commitment. Reliance in those circumstances was entirely reasonable. A sophisticated businessperson cannot, however, reasonably rely on what is in essence an expression of sentiment, i.e., "we'll work it out," spoken in the give and take of preliminary negotiations to nullify an express and definitive provision that appears in a document to which the businessperson subsequently subscribes. See *Plummer* v. *Luce*, 310 Mass. 789, 805 (1942); *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. at 731.

[8]Like the judgment, the record is elephantine. There are ten volumes of transcript (recording fifty-seven days of trial); seven volumes of exhibits; and three volumes of record-appendix.

financing, details of the proposed note, use of F-M's com-
puter data, labor contracts, potential liabilities, and tax mat-
ters. Markus expressed himself as confident that Schwanbeck
and F-M could work out an arrangement with regard to the
first security interest that would be satisfactory to Edwards.

About a week later, on November 25, 1981, Schwanbeck's
lawyer, Mr. Stephen Carr, dispatched a draft of a definitive
purchase and sale agreement. It ran fifty-four pages, exclu-
sive of referenced but as yet unprepared schedules and ap-
pendices which would contain much of the critical economic
data. Although the draft contained mainly standard mate-
rial, there was considerable in the way of assumption of lia-
bilities and representations to talk about. In economic terms,
the most striking aspects in which the draft agreement devi-
ated from the letter of intent were that it did not offer a
100% security interest to secure the $1,000,000 note to be
given by Schwanbeck's corporation; it did not mention pay-
ing for some $50,000 of accounts receivable; and it injected a
proviso that the Vellumoid division, while still run by F-M,
maintain a certain (but unstated) minimum profit pending
consummation of the sale. At the same time, F-M, without
telling Schwanbeck, was also dealing with the rival Par-
seghian group, consisting of Parseg Parseghian as principal
entrepreneur, Robert Herford as financial expert, and Robert
Hight as the group's lawyer.

Not much time elapsed between Carr's dispatch on No-
vember 25, 1980, of the draft on behalf of Schwanbeck and
December 1, 1980, when Schwanbeck's right of first refusal
ran out. The expectation manifested in the letter of intent by
the short right of first refusal, that seller and buyer would
move to a definitive purchase and sale agreement in a
month's time, had been disappointed. On December 11, that
right was renewed and extended at the initiative of F-M to
January 15, 1981. Having not concluded a deal with either
prospect, F-M was apparently interested in continuing to
play both fish. Also on December 11, 1980, Markus asked
Schwanbeck to postpone applying for industrial revenue bond
financing because he did not want to make the proposed sale

of the Vellumoid division public knowledge. The judge infers that "this was a deliberate effort to permit completion of his [Markus'] negotiations with the Parseghian group and to run out time on Schwanbeck." We think that inference logically insupportable. On that date the Parseghian preliminary oral proposal had not yet been made, and, if the purpose of Markus was to run out the string on Schwanbeck, he would hardly that same day have taken the intiative — as he did — to lengthen Schwanbeck's string by a month and one-half.

F-M in late November made the appraisals Schwanbeck had procured available to Herford of the Parseghian group. Those appraisals bore the name of Schwanbeck and his business so that it required no prodigy of imagination for the Parseghian group to deduce that Schwanbeck was their competitor. F-M did not make reciprocal information about the Parseghian group available to Schwanbeck.

On December 16, 1980, Herford orally outlined to F-M the terms of an offer on behalf of the Parseghian group that differed in some material aspects from the Schwanbeck deal. It presupposed, for example, a first security interest in only the real estate of the Vellumoid division, a lien in personal property secondary to that of a financing company, a smaller note but the issuance of preferred stock in exchange, and the guaranty of certain receivables. F-M did not communicate these terms to Schwanbeck. Five days before, Schwanbeck had been in Michigan negotiating with F-M. At that time he had asked if anyone else was looking at the business and Markus had told him, falsely, that nobody had been looking at the business since late summer. Schwanbeck and F-M were still at loggerheads about the first security interest issue. Markus hinted at possibilities of trading a higher potential interest rate[9] for a different position on the security interest. In mid-December, Philip Embury, a member of F-M's house legal staff, sent a counter draft to Schwanbeck's law-

[9] The interest rate in the note Schwanbeck's corporation was to give to F-M was tied to the prime rate which at the time was extremely volatile. The letter of intent had placed a "cap" of 13% on the interest rate, even should the prime rate exceed that level.

yer. Schwanbeck had further discussions with F-M's trea-
surer, Edwards, about the impracticality of giving a 100%
security interest to F-M, as contemplated by the letter of in-
tent. Edwards did not budge on the issue, although by that
time alternatives were being discussed with the Parseghian
group.

Early in January the Parseghian group deal accelerated.
On January 8, 1981, Parseghian and F-M's chief legal of-
ficer initialled a draft of a forty-five page agreement. The
initialling was done so that the draft agreement might be ex-
hibited to potential sources of capital. Although definitive in
structure, there were, as will appear, some significant un-
resolved matters. Neither the fact of the initialling nor the
terms of the Parseghian group's deal, as they then stood,
were communicated to Schwanbeck. On January 15 Markus
and Embury called Carr. There was conversation about the
draft agreement with Schwanbeck, during the course of
which Markus became angry and unreasonable. At the con-
clusion of the telephone conversation, Markus terminated
further discussions with Carr. The judge found Markus' an-
ger to have been feigned, a pretext to avoid reaching a defini-
tive agreement with Schwanbeck before January 15, 1981.
We assume the judge had in mind that January 15 was the
deadline of Schwanbeck's right of first refusal. The question,
however, is not whether Schwanbeck and F-M had come to
definitive agreement on that date — they had not — but
whether on that date F-M had a firm, enforceable offer from
someone else, a question to which we shall come. On Janu-
ary 15 Schwanbeck also learned that the appraisals he had
commissioned were being used by someone else.

On February 2, 1981, F-M and the Parseghian group exe-
cuted a definitive, binding purchase and sale agreement at a
purchase price of $2,272,799. The transaction closed on Feb-
ruary 27, 1981. From January 1, 1981, through Febru-
ary 27, 1981, the judge found, Schwanbeck was ready, will-
ing, and able to purchase the Vellumoid division from F-M

on the terms which governed the Parseghian deal.[10] The failure by F-M to offer those terms to Schwanbeck or to accede to Schwanbeck's request for concession on the first lien requirement represented, the judge found, a failure to negotiate a definitive agreement with Schwanbeck in good faith.

Good faith is not self-defining, and whether Markus, Edwards, and Embury, on behalf of F-M, acted in good faith is a mixed question of fact and law. See *Spiegel* v. *Beacon Participations, Inc.,* 297 Mass. 398, 416-417 (1937); *Hartford Acc. & Indemn. Co.* v. *Millis Roofing & Sheet Metal, Inc.,* 11 Mass. App. Ct. 998, 999-1000 (1981). Bad faith was certainly not implicated in F-M's dealing with another buyer. That right was reserved with special emphasis that no moral obloquy was to attach to F-M's keeping several balls in the air. Want of good faith "carries an implication of a dishonest purpose, conscious doing of wrong, or breach of a duty through motive of self-interest or ill will." *Ibid.* Here F-M had announced its purpose to deal with others and its intention to pursue its self-interest. Fairly understood, F-M's reservation would include the right to drag its heels with Schwanbeck, as long as F-M honored Schwanbeck's time-limited right of first refusal. There was no expressed obligation to deal on a precisely parallel basis with the competing buyers, and we do not think the law implies such an obligation. The competing buyers brought different characteristics and backgrounds to the bargaining table. What might seem a reasonable term with one buyer might not look attractive with the other. Indeed, one party might begin to look like a more attractive buyer, a reasonable consideration when there will be an ongoing relationship, as was to occur here. Apart from the inevitable transition management problems, there was to be the continuing financing connection. Although it was selling the Vellumoid division assets, F-M, as financier, was going to continue to have a major stake in the business.

---

[10]The sole evidentiary basis for that finding is Schwanbeck's say-so. He had not at any time between October 31, 1981, and February 2, 1981, obtained a financing commitment.

It is understood that, when parties bargain, each tries to get the best from the trade. They are in an adversary, not a fiduciary, relationship. Contrast *Donahue v. Rodd Electrotype Co. of New England*, 367 Mass. 578, 594 (1975). A demand in negotiations may not represent the final fallback position, but businesspersons understand this. *Feldman* v. *Allegheny Intl., Inc.*, 850 F.2d at 1223. *Candid Productions, Inc.* v. *International Skating Union*, 530 F. Supp. at 1335. The cause of ebullient business competition would be ill served by requiring negotiating parties to disclose their final positions during the bargaining process. *Feldman v. Allegheny Intl., Inc., supra* at 1223. More open dealing by F-M with Schwanbeck concerning the parallel negotiations with the Parseghian group may have been better business manners, but the law does not require so precious a standard.

On the basis of the facts found by the trial judge and the legal standards we have discussed, F-M satisfied the obligation to negotiate in good faith. There is no finding, and no evidence, that F-M used Schwanbeck from the outset as a foil or treated with him for a purpose other than expecting that it might sell the Vellumoid assets to him. The findings reflect considerable effort by F-M to conclude an agreement with Schwanbeck on terms F-M thought advantageous and protective of its interests. In time, Schwanbeck fell to the position of less-favored customer. The Parseghian group had some strengths Schwanbeck did not. Parseghian himself had long experience in the automobile industry, particularly sales, and F-M could reasonably size him up as a more promising prospect for managing the Vellumoid business, which catered to the automobile industry. The Parseghian group was more inventive on the question of security. It had countered with a proposal of a first security interest in the realty, a secondary interest in personalty, and the preferred stock device. The chemistry between the F-M negotiators and the Parseghian group seems to have been more comfortable than it was with Schwanbeck. There is no legal requirement that a prospective seller get along with prospective customers equally.

2. *The right of first refusal.* While F-M was free to with-
hold information from Schwanbeck about competing negotia-
tions during the formative stage, it had a duty, under the
letter of intent, to afford him fifteen days to meet the terms
of a firm offer by a third party to purchase the Vellumoid
assets.[11] The question is whether F-M had received an en-
forceable offer to buy by January 15, 1981, the expiration
date of Schwanbeck's right of first refusal.[12] See *Roy* v.
*George W. Greene, Inc.,* 404 Mass. 67, 70 (1989). Cf. *Stone*
v. *W.E. Aubuchon Co.,* 29 Mass. App. Ct. 523, 526 (1990).
The trial judge concluded that a firm offer had been made
January 8, 1981.[13] That, it will be recalled, was the day on
which Parseghian, his lawyer associate, and F-M's chief legal
counsel initialled a draft agreement. Whether a document
contains the elements which make it an enforceable contract
is a question of law, rather than fact. See, e.g., *Saxon Thea-
tre Corp.* v. *Sage,* 347 Mass. 662, 666 (1964); *Blair* v.
*Cifrino,* 355 Mass. at 709.

We think that the January 8 initialled draft was not an
enforceable offer because it contained a major hole pertain-
ing to how the buyer would pay the purchase price, and the
amount of that price, itself, was unresolved. Compare *Wilgus*
v. *Salt Pond Inv. Co.,* 498 A.2d 151, 156 (Del. Ch. 1985).

---

[11]F-M contends that the general disclaimer of binding effect in the letter
of intent overrode the right of first refusal. This is a variation on the theme
argued by F-M in relation to the "intention to proceed in good faith." We
think the case for interpreting the right of first refusal provision as unaf-
fected by the general disclaimer is even stronger. Once again, the pertinent
provision is introduced by the separating word, "however," and there
would be no point in articulating a right of first refusal with a mechanism
for its exercise unless the parties intended it to have some meaning.

[12]The trial judge made an ultimate finding that F-M had a duty to nego-
tiate with Schwanbeck beyond the date of expiration of the right of first
refusal because F-M's conduct had caused a failure to conclude a defini-
tive agreement with Schwanbeck. In light of our decision in part 1 of this
opinion, that F-M was not obliged to come to definitive agreement with
Schwanbeck, the judge's finding in this regard has no foundation.

[13]The judge made his findings on liability in 1986 and, therefore, did not
have the benefit of the opinion in *Roy* v. *George W. Greene, Inc.,* 404
Mass. 67 (1989), which explicated the elements of a firm offer which
would trigger a right of first refusal.

The January 8 draft reflected that the corporation to be formed by the Parseghian group would pay in part by issuing preferred stock to F-M. Various figures for what value the preferred stock should represent had been tossed about, fluctuating between $200,000 to $300,000. The January 8 draft said no more than that, "The purchaser shall deliver a certificate or certificates for _____shares of its Preferred Stock . . ., which Preferred Stock shall have the attributes described in Exhibit Three to this Agreement." There was, at the time, no Exhibit Three,[14] and, consequently, a significant portion of the price and method of payment was left unstated. In the final agreement, a value of $300,000 was assigned to the preferred stock. That stock was to yield cumulative dividends payable semi-annually, beginning with the 37th month after closing, first at a rate of 10%, then climbing in annual increments to a rate of 20%, beginning with the 73d month out. The stock would be redeemable at par during the first three years, and redeemable thereafter for $384,000, plus any unpaid and accrued dividends. These were details of substantial financial significance, and how they were worked out was largely a matter of negotiating strength and the peculiar wishes and needs of the parties. There would not be objective criteria for a commercially reasonable solution by which a court might dictate how much value should be assigned to preferred stock rather than straight debt. With what dividend rate? With what redemption terms?[15] To be enforceable, the essential terms of a contract must be certain unless the commercial circumstances enable a court to fill in the blanks. *Caggiano* v. *Marchegiano*, 327 Mass. 574, 579 (1951). *Simons* v. *American Dry*

---

[14]Nor were there exhibits one and two. Exhibit one was to be a schedule of liabilities which the buyer was to assume, the total estimated size of which was to be deducted from the sale price. Exhibit two was to be the promissory note in the amount of $1,100,000 which the buyer was to deliver to the seller. The content of the promissory note was well defined by the text of the proposed agreement, but the list of liabilities and their valuation was a more material open subject.

[15]The characteristics of the preferred stock were tailored to encourage early redemption by the issuing corporation.

*Ginger Ale Co.*, 335 Mass. 521, 523 (1957). See Restatement (Second) of Contracts § 204 (1979).

Just which of the seller's liabilities the buyer would assume, and what dollar amount would be assigned to them, were also not minor negotiating points because they bore on the purchase price. See *Geo. W. Wilcox, Inc.* v. *Shell Eastern Petroleum Prod., Inc.*, 283 Mass. at 388. Ultimately, the parties assigned $85,000 to specifically identified liabilities of F-M, which the buyer would assume. In relation to the ultimate net purchase price at closing of $687,786,[16] amounts such as the $300,000 allocated to preferred stock and $85,000 to assumed liabilities were significant figures; they influenced heavily the amount of financed capital and investment capital the buyer would have to produce.

Comparison of terms of the January 8 draft and the executed agreement of February 2, 1981, demonstrates that the earlier document was not merely fluid in theory, but also in practice. The January 8 draft provided for a deduction of $200,000 from inventory, the final contract had no such deduction; the January 8 draft added $50,000 to book value, the final contract omitted that $50,000 sum; the January 8 draft assigned $1.00 to tooling, the final contract assigned $38,000; the January 8 draft assigned $1.00 to good will, the final contract assigned $10,000; the January 8 draft assigned $1.00 to a covenant not to compete, the final contract assigned $2,000; the January 8 draft provided that the buyer should pay a portion of the purchase price with a $1,100,000 note to the seller, the final contract provided for a note of $950,000, provided for an interest rate of up to 20% and that the buyer would pay half of retained earnings over $150,000 in reduction of principal; the January 8 draft provided for a first security interest in *all* the assets, i.e., realty and personalty, of the buyer, the final contract provided for a first security interest in the realty of the buyer and a second position as to personalty, junior only to ITT Diversified

---

[16]There were post-closing adjustments to that figure.

Credit Corp.;[17] and the January 8 draft said nothing about special protection from the seller as to accounts receivable from the Chrysler Corporation, the final contract provided that, should Chrysler go into bankruptcy,[18] the seller would buy up to $100,000 of the buyer's accounts receivable from Chrysler. In addition, there was, in the final draft, the filling in of the open ends as to preferred stock and how much would be assigned to liabilities.

There must have been some time before February 2 when F-M and the Parseghian group had hammered out the significant business points so that it could be said that F-M had a firm offer. That date appears to have been January 27, 1981, when another draft was exchanged (other drafts had been exchanged between January 8 and January 27) which very closely resembles the final contract. F-M also prepared a document along those lines with Schwanbeck's name in it. There was a meeting between Schwanbeck and Markus on January 28, 1981, at which Markus purported to tell Schwanbeck the terms of the Parseghian group deal and afforded Schwanbeck a chance to match it. At that meeting, the trial judge justifiably observed, Markus "had no intention whatsoever of permitting the sale to Schwanbeck to occur" and that "Markus' perfidy was boundless."[19] He not only did not give Schwanbeck a copy of the draft agreement but proceeded to state terms which were less favorable to the buyer than the terms then agreed upon with the Parseghian group.

---

[17]The trial judge correctly found that this provision in the January 8 draft misstated what F-M and the Parseghian group had by then agreed upon, but the discrepancy illustrates how comparatively useless, and, indeed, misleading, the January 8 draft was as a memorandum of a firm and enforceable offer.

[18]Chrysler was a major customer of the Vellumoid division and in 1980 was seen as financially fragile.

[19]While justifiable, those findings were not compelled. At that juncture, Markus was free of any legal obligation to deal with Schwanbeck and had some residual uncertainty about the Parseghian group because its financing commitment had not come through (it came through January 30, 1981). Markus could, thus, be seen as engaged in a last ditch effort to extract a better deal from Schwanbeck should the favored transaction with the Parseghian group fizzle.

By that time, however, Schwanbeck's right of first refusal had already expired,[20] and the deceit and posturing of Markus was without legal consequence. January 28, 1981, was a Wednesday, and the scheduled signing with the Parseghian group was the following Monday. As a practical matter, Schwanbeck could not secure financing to meet the terms described (or the real ones) in the short time span available. He does not suggest that he tried to do so. Thus, Schwanbeck did not rely and change position to his detriment on the basis of the Markus charade. Contrast *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. at 707-708, 713 (1990). The conduct of Markus was shabby and infuriating but not actionable.

3. *Fraud on the part of F-M.* The trial judge made an ultimate finding that F-M "made knowingly false and misleading statements of a material nature intending the plaintiff to rely upon them and upon which the plaintiff relied to his detriment." There are four subsidiary findings which may be the basis for that ultimate finding.

(i) The judge found that the estimates Markus made, prior to the execution of the letter of intent, of the value of the assets of F-M were not realistic. It is doubtful that the judge found this to be a misrepresentation. He does not so state, but in an abundance of caution we give the point consideration. Estimates of value by a prospective seller to a prospective customer, especially a sophisticated one, cannot be seriously considered as a representation. What the seller depicts as a golden goose the buyer describes as an albatross; the seller's lake is the buyer's pond. In any event, Schwanbeck wasted no reliance on the Markus estimate. He was insistent

---

[20]The trial judge found that the right of first refusal expired January 15, 1981. F-M argues that the extension of the right of first refusal to January 15 (effected by a handwritten, initialed notation on an executed copy of the letter of intent) was not valid for want of consideration. To be sure, F-M's extension of the right of first refusal was gratuitous in the sense that Schwanbeck gave nothing for it on December 11, 1980, the date the extension was initialed. Less formalistically viewed, however, Schwanbeck's consideration was reliance on still being in the race and, therefore, spending energy, time, and money (e.g., for transportation) to continue to negotiate with F-M.

on obtaining his own appraisals and had his own handle on an approximation of value even before he signed the letter of intent.

(ii) The judge found that F-M had agreed, in conversation before the signing of the letter of intent, that it would not disclose the appraisals obtained at the expense of Schwanbeck and F-M. We have previously expressed our view that the judge's finding is on a very shaky footing. The letter of intent contains no such restriction and expressly allows F-M to use the appraisals. "[A] contractual provision flatly contradictory to prior oral assurances should cause most people — and particularly experienced, knowledgeable businesspeople — to pause. Moreover, if a [factfinder] is allowed to ignore contract provisions directly at odds with oral representations allegedly made during negotiations, the language of a contract simply would not matter anymore." *Turner* v. *Johnson & Johnson*, 809 F.2d at 96. There is no evidence that Schwanbeck thought the language in the letter of intent (which had been thoroughly vetted by his lawyer) was inconsistent with his understanding and that he had discussed the question with F-M after reading the text of the document. Compare *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. at 706-714. More to the point, the extent of Schwanbeck's detrimental reliance on the alleged misrepresentation is that he ordered and paid for his share of the appraisals. If his position is that he would not have undertaken that cost had he known the material might be shown to competitors, then he is entitled to reimbursement for his costs incident to the appraisals.

(iii) The judge found that F-M dissembled about its true intention in dealing with Schwanbeck. The record, however, does not support the proposition that F-M never intended to sell the Vellumoid assets to Schwanbeck. At the outset, F-M was obviously very interested; hence, the letter of intent, the extension of the date of the right of first refusal, and so forth. That at some point, as we discussed, F-M became cooler to Schwanbeck and preferred the prospects with the Parseghian group does not alter the character of the initial exchanges.

(iv) The judge found that F-M had falsely stated to Schwanbeck on December 11, 1980, that no one since the late summer had expressed interest in buying the Vellumoid assets. The pertinent next question is how did Schwanbeck rely on that misrepresentation to his detriment. There are no subsidiary findings on this score. Would he have abandoned his efforts had he received a straight answer on the date? By that time, Schwanbeck had expended the bulk of his energy and costs on the proposed acquisition project, although, as we have suggested above, there was obviously some cost attendant on his efforts after December 11, 1980. Conversely, might he have pursued his quarry more assiduously? Schwanbeck does not suggest what steps he might have taken had he known a competitor was in the field. Schwanbeck's reliance to his detriment is not elucidated, but it is a non sequitur to say that he failed to reel in the Vellumoid assets because he was misinformed about the existence of competition.

4. *Tortious interference by new Vellumoid.* Vellumoid, Inc. ("new Vellumoid"), was incorporated under the laws of North Carolina on January 29, 1981, a Thursday. If the date of its birth is included, new Vellumoid had four days (inclusive of Saturday and Sunday) to engage in tortious interference with the contractual and advantageous relations of Schwanbeck with F-M, unless the alleged sins of the corporation's progenitors (the members of the Parseghian group) impose liability upon their corporate creature. The parties have not argued the point. We take the case as presented, i.e., whether, on the facts found by the trial judge, new Vellumoid is chargeable, as he ruled, with tortious interference with contractual and advantageous economic relationships.

"[S]omething more than intentional interference is required" to make out the tort. *United Truck Leasing Corp.* v. *Geltman,* 406 Mass. 811, 815 (1990). The additional ingredient is improper conduct, which may include ulterior motive (e.g., wishing to do injury) or wrongful means (e.g., deceit or economic coercion). *Id.* at 816. See *Leigh Furniture & Carpet Co.* v. *Isom,* 657 P.2d 293, 302-304 (Utah 1982). Com-

peting for the prize is within the realm of permissible inter-
ference. *Doliner* v. *Brown*, 21 Mass. App. Ct. 692, 695-696
(1986) (defendant "seeking to acquire the same object, not
in order to inflict injury on [the plaintiff], but for his own
commercial advantage").

On the facts found, the Parseghian group was a competi-
tor. Its sole object was to buy the Vellumoid division assets.
There was no evidence of ulterior motive or desire to harm
Schwanbeck, with whom the Parseghian group had no previ-
ous relationship or, for that matter, acquaintance. The Par-
seghian group conducted no improper espionage, used no lev-
erage, and did not spread false rumors about Schwanbeck. It
was not improper for the group to learn from F-M that
Schwanbeck was in the field and such elements of the
Schwanbeck-F-M negotiations as F-M may have revealed.
The Parseghian group did not purloin that information. The
group knew someone else was in the field, but, as Herford, a
member of the group, testified on deposition, "Faint heart
never won the fair lady." Assuming, as Schwanbeck sug-
gests, the Parseghian group knew much about what was in
the letter of intent, the group would then have known F-M
had reserved the right to carry on multiple negotiations. The
group would also have known on February 2, 1981, that
Schwanbeck's right of first refusal had expired. The ruling
that new Vellumoid had wrongfully interfered with contrac-
tual and advantageous economic relationships between
Schwanbeck and F-M was in error. Compare *G.S. Enter-
prises, Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 274-
276 (1991).

5. *Claims under G. L. c. 93A.* Although we have con-
cluded that Schwanbeck's common law claims are not
soundly based, G. L. c. 93A, § 11, affords businessmen cer-
tain remedies "that elude conventional definitions and cate-
gories." *Doliner* v. *Brown*, 21 Mass. App. Ct. at 697. In the
course of the *Doliner* opinion we cautioned that the statute
ought not to be read as punishing every departure from "the

punctilio of an honor the most sensitive,"[21] while, nonetheless, in certain cases enforcing "standards of behavior measurably higher than perfidy." *Id.* at 698. Breach of warranty, for example, has been the basis of a c. 93A action. *Linthicum* v. *Archambault*, 379 Mass. 381, 387 (1979).[22] See also *Maillet* v. *ATF-Davidson Co.*, 407 Mass. 189, 190 (1990).

As to new Vellumoid, the facts as found by the trial judge do not describe conduct which a businessman would consider reprehensible and, therefore, constituting behavior which, in context, would register as unfair and deceptive acts. New Vellumoid did not broadcast misleading information about Schwanbeck or its own intentions; it committed no coercive acts; it did not trick Schwanbeck into changes of position concerning what he wanted. New Vellumoid competed for the prize. We are of opinion that the judge's ultimate finding that "Vellumoid, Inc. was guilty of unfair and deceptive acts or practices. . . with respect to Schwanbeck" lacks foundation in the judge's subsidiary findings. See *National Med. Care, Inc.* v. *Zigelbaum*, 18 Mass. App. Ct. 570, 574 (1984).

As to F-M, the question arises whether F-M played Schwanbeck as prospective buyer too long and exhibited insufficient candor about making him aware that he was receding from favor. Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 616 (1983), the boundaries of what may qualify for consideration as a c. 93A violation is a question of law. See *Mechanics Natl. Bank* v. *Killeen*, 377 Mass. 100, 108-110 (1979); *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979). We think it defeats commercial expectations and foments litigation to impose too delicate a standard of negotiating conduct, particularly among commercially sophisticated contending parties. Cf. *Spence* v. *Boston Edison Co.*, 390 Mass. at 616; *Teitelbaum* v. *Hallmark Cards, Inc.*, 25 Mass. App. Ct. 555, 562 (1988). Contrast *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. at 706-714. During

---

[21]*Meinhard* v. *Salmon*, 249 N.Y. 458, 464 (1928).

[22]Other examples appear in the *Doliner* opinion at 697.

the course of parallel negotiations with different parties, a right which F-M expressly reserved, it is not reasonable to require that the details discussed with one party promptly be published to the other. F-M had not undertaken to hold an auction, and, indeed, pressuring one party with the proposals of the other might have been regarded as manipulative and, hence, improper. Each potential purchaser need not be treated equally, not least of all, as we have suggested above, because the prospective seller is entitled to make varying risk assessments about the different parties with which it is dealing.

It remains to inquire whether the false statements previously discussed are a basis for a c. 93A claim. In terms of their character, those statements are candidates for c. 93A liability, see e.g., *International Fid. Ins. Co.* v. *Wilson*, 387 Mas. 841, 848-849 (1983), but to be actionable under that statute they must be consequential. See *Homsi* v. *C.H. Babb Co.*, 10 Mass. App. Ct. 474, 479 (1980); *Greenstein* v. *Flatley*, 19 Mass. App. Ct. 351, 358 (1985); *Wasserman* v. *Agnastopoulos*, 22 Mass. App. Ct. 672, 675-677 (1986). There must be a loss of money or property. G. L. c. 93A, § 11. *Baldassari* v. *Public Fin. Trust*, 369 Mass. 33, 46 (1975). *Tower* v. *Hirschhorn*, 397 Mass. 581, 590 (1986). The false statements concerned: (i) the estimate of value of the Vellumoid assets; (ii) the statement said to have been made by F-M that it would not give appraisal information to other potential buyers as long as Schwanbeck was still in the picture; (iii) the statement on December 11, 1980, that no other party had shown interest in buying the Vellumoid assets since the end of summer; and (iv) the misstating on January 28, 1981, of the terms on the basis of which F-M proposed to sell to the Parseghian group. Our analysis under part 3 of this opinion demonstrated that statements (i) and (iv) were inconsequential and, hence, involved no loss of money which might make the statements actionable under c. 93A. Statements (ii) and (iii) cost Schwanbeck something: his expenditures on the appraisals (about $3,500) and

his out-of-pocket costs in connection with sticking with the negotiations after December 11.

6. *A postscript on damages.* Although we have decided that the liability of F-M is of a narrow nature from which only limited damages flow, the damages found by the judge are so remarkable that a few words of comment seem in order.[23] The judge calculated potential earnings from the Vellumoid assets as $3,820,046 for the years 1981 through 1985, inclusive, and then added $6,396,077 as the profit to be made from a hypothetical sale of the business in 1986. That produced a total of $10,216,123. Under the c. 93A counts, this was doubled to $20,432,246. To that the judge added interest of $9,630,398.60, and attorneys' fees of $2,453,724, for a grand total of $32,516,368.60.

Although lost profits are sometimes awarded in Massachusetts when quantities of an item, sales rates, and profit ratios are reasonably ascertainable, the cases also warn against awarding speculative profits. Compare *Lowrie v. Castle*, 225 Mass. 37, 51-52 (1916), and *International Totalizing Sys., Inc. v. PepsiCo, Inc.*, 29 Mass. App. Ct. 424, 430 (1990), with *Air Technology Corp. v. General Elec. Co.*, 347 Mass. 613, 627 (1964), *Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc.*, 14 Mass. App. Ct. 396, 424-431 (1982), and *City Welding & Mfg. Co. v. Gidley-Eschenheimer Corp.*, 16 Mass. App. Ct. 372, 374-375 (1983). Cf. *Shapiro v. Grinspoon*, 27 Mass. App. Ct. 596, 604-605 (1989). Authorities urging the case for damages in failed contract formation if one side has caused the collapse write that "it makes good sense to measure liability, as a rule, on the basis of the reliance interest and not in terms of the benefit anticipated, the expectation interest." Kessler & Fine, *Culpa in Contrahendo*, 77 Harv.L.Rev. at 405. The Restatement (Second) of Contracts § 351(3) cautions that, "A court may limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circum-

---

[23]Our decision on liability eliminates any need to consider Schwanbeck's arguments on cross-appeal relating to damages.

stances justice so requires in order to avoid disproportionate compensation."

Schwanbeck is entitled to what he spent on the appraisals and what he spent on staying in the negotiations after December 11, 1980. Those damages may be multiplied (doubled or tripled) by the trial judge and Schwanbeck may recover legal fees allocable to proving those two misrepresentations and the damages which flowed from them.

7. *Conclusion.* The judgment is reversed. The case is remanded for consideration of damages and legal fees on the limited basis stated.

*So ordered.*