Fahey, J.
The defendants, Sarni Cleaners of Fra-mingham, Inc., Mario J. Sarni, Ronald C. Sarni, and Patricia Sarni, have brought this motion for summary judgment pursuant to Mass.R.Civ.P. 56(c) on nine (counts II, VIL VIE, IX, X, XIII, XIV, XV, and XVIII) of the eighteen counts of the amended verified complaint. Of the remaining nine counts, four (counts V, VI, XI and XII) have been voluntarily dismissed by the plaintiffs, and the other five (counts I, III, IV, XVI and XVII) are not at issue in this motion.
BACKGROUND
This is an environmental contamination dispute associated with the commercially leased properties located at 2058 and 2060 Commonwealth Avenue in the Auburndale Plaza in Newton, Massachusetts. The 2058 location was operated as a coin-operated laundromat, while the 2060 location was used for a dry-cleaning business.
Constructed in 1962, the Auburndale Plaza was owned and managed by the Lyndave Trust, a realty trust, and by the Mugar Group until approximately 1994 or 1995. The Plaza is now owned by Mugar’s business partnership, Auburndale Plaza LLP, and its successor-by-merger, Auburndale Plaza LLC, and managed by its managing partner, Gravestar, Inc.
The 2058 property, similar to the 2060 property,[1] was leased by the Lyndave Trust to Sarni Cleaners and Launders, Inc. on August 1, 1962. The lease was assigned to Sarni Cleaners of Framingham, Inc. (hereinafter SCFI), with the assent of the landlord, on April 27, 1967. In exchange for its approval of this assignment, the landlord required Ralph Sarni, II, James Sarni, Sr., Mary Sarni, James Sarni, Jr., and Mario J. *672 Sarni to “jointly and severally guarantee the performance of all the terms, covenants and conditions” of the lease. By May 1972, however, SCFI sold the laundromat business to Defendant Charles H. Miller and, with the landlord’s approval, assigned the 2058 lease to Miller. As part of the assignment, SCFI agreed to continue to be liable for all of the covenants included in the original lease, up through and including January 31, 1974.
When the lease for the 2058 property was signed in 1962, that parcel of Auburndale Plaza was still under construction. As part of the construction, an underground storage tank (hereinafter UST) was installed beneath the paved common parking area of the 2058 Commonwealth Avenue property for the sole purpose of heating water used in the dry-cleaning process. For purposes of this motion, it is uncontested that a release of fuel oil that contaminated the Auburndale Plaza site was caused by a leak in a remote fill pipe of the UST. This case arises as a result of the clean-up of the contamination by the landlord, and its attempt to be reimbursed by the tenants for its efforts.
DISCUSSION
Summary judgment is appropriate when no material facts are in dispute and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Highlands Ins. Co. v. Aerovox Inc., 424 Mass. 226, 232 (1997). When a party does not bear the burden of proof at trial, it is entitled to summary judgment if it submits affirmative evidence, unmet by countervailing materials, that either negates an essential element of the nonmoving parly’s case or demonstrates that the nonmoving party has no reasonable expectation of proving an essential element of its case. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Count II
Because an individual may be liable under chapter 93A for the actions taken by that individual, see Nader v. Citron, 372 Mass. 96, 103 (1977), and because “whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact,” Schwanbeck v. Federal-Mogul Corp., 31 Mass.App.Ct. 390, 414 (1991) citing Spence v. Boston Edison Co., 390 Mass. 604, 616 (1983), on the unspecified allegations before me, I cannot determine as a matter of law that the facts alleged by the plaintiff are definitely not within “the boundaries of what may qualify for consideration as a c. 93A violation ...” Id. Without knowing, at the very least, the factual bases for the plaintiffs claim that the defendants “engaged in a pattern of delay and dilatory tactics,” I cannot determine, as a matter of law, that the plaintiffs cannot prevail on this claim. Accordingly, the defendants’ motion for summary judgment on count II is denied.
Counts VII, VIII, IX, X, XIII, XTV, XV
In order for the defendants /tenants to succeed on summary judgment here, it is necessary to find that it was the plaintiff/landlord who was responsible for the maintenance of the UST and not the tenants. Each of the legal bases, upon which the plaintiff relies in opposing the summary judgment motion, requires a preliminary finding that the defendants were contractually bound to provide for the maintenance of the UST in question. The 1962 lease and the 1972 assignment must determine whether the defendants were so contractually bound to provide for the UST. Since it is unclear from the outset exactly which lease provision is controlling in this case, there are two crucial questions which must be answered: 1) does the underground storage tank at issue here qualify as a “trade fixture?”; and 2) is this determination a question of law or fact? “[I]n determining what are fixtures, the common law rules prevailing between a landlord and a tenant for years shall govern.” G.L.c. 184 §12. Massachusetts case law in this area indicates that whether a chattel is indeed a fixture is a question of fact.
“If an article used in connection with realty is peculiarly adapted or essential to the use of the realty and is affixed to it, it generally becomes part of the real estate. The term ‘fixture’ is sometimes used to designate articles of personal property which, upon becoming affixed to real estate, become part of [that real estate]. It is more often used to designate articles of personal property which, although affixed to real estate, are removable as between landlord and tenant.” Massachusetts Practice, volume 33 §781. Further, such items become known as “trade fixtures” when a tenant uses them to “pursue the trade or business for which he occupies the premises, or to be used in connection with such business.” Id. A chattel may be considered a fixture if it falls into one of the following three categories:
1. Those where the chattel has been so affixed that its identify is lost, or so annexed that it cannot be removed without material injury to the real estate or to itself.
2. Those articles which are manifestly furniture as distinguished from improvements . . .
3. Those cases where intention is the controlling fact and where such fact is to be determined upon consideration of all the circumstances, including therein the adaption to the end sought to be accomplished by the means, form and degree of annexation[2]
See Stone v. Livingston, 222 Mass. 192, 194-95 (1915) (citations omitted).
Given these guidelines for ascertaining whether a chattel is a “trade fixture,” the question remains whether the UST at issue here would qualify.[3]
*673 Of the three aforementioned categories of cases which were set out by the SJC in Stone this case surely falls into the first one. The Court expounded upon this category when it held that “[w]here the chattel is so affixed to the realty that its identity is lost, or where it cannot be removed without material injury to the realty or to itself, the intent to make it a part of the realty may be established as a matter of law but ordinarily its determination requires a finding of fact. Consideration must be given to the nature of the chattel and the apparent object, effect, and mode of its annexation to the realty.” Bay State York Co. v. Marvix, Inc., 331 Mass. 407, 411 (1954) (citations omitted). Consequently, in this case, in order to find as a matter of law that the UST was a trade fixture, a determination must be made that the UST was “so affixed to the realty that its identity [was] lost,” see Shell Oil Company v. Capparelli, 648 F.Supp. 1052, 1056 (S.D.N.Y. 1986) (“[T]he fact that the tanks are affixed to the realty is not enough, by itself, to prove that the tanks were installed in order to improve the subject premises, rather than being installed for use as trade fixtures”), or that “it [could not] be removed without material injury to the realty . . .” See Mathey v. Charlestown Five Cents Savings Bank, 290 Mass. 510 (1935) (finding that a blower could be detached from building without substantial injury lead to conclusion that it was personal property). In order to make this determination here, the location, usage, and intention of the parties must be considered. See Bay State, supra (factual determination as to whether four air conditioners and a water tower were permanent fixtures); Nadien v. Bazat, 303 Mass. 496, 499 (1939) (“Articles fully as ponderous, as firmly attached, and as difficult to remove [as bowling alleys and racks], and indeed complete buildings, may retain the character of pure chattels, if such is the intention”); SGRO v. Getty Petroleum Corp., 854 F.Supp. 1164, 1180 (D.N.J. 1994) (“The expressed intent of the parties and the circumstances at the time of the Agreement clearly establish that the equipment was to be treated as ‘trade fixtures’ ”). This determination, however, must be viewed as question of fact best left to be answered by a jury. In Southern Massachusetts Broadcasters, Inc. v. Duchaine, 26 Mass.App.Ct. 497, 498 (1988), the Appeals Court affirmed the trial judge’s decision to send a special question to the jury to determine whether a tower had become “so annexed” to the land upon which it sat so as to become a fixture.[4] In this case, while it is undisputed that the UST was located under the parking lot of the property and that it leaked oil causing the site’s contamination, whether the UST was a trade fixture, and how annexed to the premises it was, if at all, remains a disputed material fact.
As there are clearly material facts in dispute here, and each party has presented some evidence supporting its position, summary judgment as to these counts must be denied as the Kourouvacilis standard has not been satisfied in this case.
Count XVIII
Under G.L.c. 109A, §5(a)( 1), in order for the transfer of the marital home from Ron Sarni to Patricia Sarni to be a fraudulent conveyance, as plaintiffs have alleged in the complaint, there must be “actual intent to hinder, delay, or defraud any creditor or debtor.” That actual intention must have existed at the time of the conveyance. See Palmer v. Murphy, 42 Mass.App.Ct. 334, 345 (1997); see also, Hasbro, Inc. v. Serafino, 37 F.Supp.2d 94, 98 (D.Mass. 1999) (analyzing indicia of fraudulent intent at the time of the transfer).
The record before me indicates that the tank was removed in the fall of 1993, that Ron and Patricia Sarni refinanced their home in the fall of 1993, and that he transferred his interest to his wife on December 3, 1993. These transactions occurred almost three years before the Original Verified Complaint in this case was filed on October 18, 1996. The record is quite sparse, if not totally devoid, as to the intentions of Ron and Patricia Sarni at the time they refinanced, and then transferred the properly.
The plaintiffs have offered as their sole basis of this intent, the deposition testimony of Jack Sarni, Ron’s father. “A complete failure of proof concerning an essential element of the non-moving party’s case renders all other facts immaterial.” Kourouvacilis, supra at 711. Jack Sarni’s statement that “(Ron) was worried he was going to lose everything; they were going to take his house,” is not sufficient evidence to meet the minimum threshold of Kourouvacilis to survive a summary judgment motion. Jack Sarni’s deposition testimony, relied on by the plaintiff does not indicate when Ron Sarni told him he was worried that he would lose his house, and certainly reveals nothing of Ron Sarni’s intention at the time of the transfer. As such, the motion is allowed as to count XVIII.
ORDER
For the foregoing reasons, defendant’s motion for summary judgment on counts II, VII, VIII, IX, X, XIII, XIV, and XV of the complaint is hereby DENIED. Defendant’s motion for summary judgment as to count XVIII is hereby ALLOWED.

 The 2060 property, which is not the subject of the current litigation, was originally leased to Sarni Cleaners and Launders, Inc., by a lease dated June 15, 1958, signed by Ralph Sarni II, as president of Sarni Cleaners. By April 1967, the Landlord had agreed to the assignment of the lease of the property to SCFI, which it continued to renew the 2060 lease until 1988. At that time, SCFI entered into a new ten-year lease with the landlord for the 2060 property. It became necessary for SCFI to remove its operations from the premises for reasons not here pertinent.

 The parties have not provided any factual basis as to category 3, the parties’ intentions.

 Concerning “trade fixtures,” the lease states in pertinent part:
Notwithstanding the foregoing, all trade fixtures, lighting fixtures, air conditioning equipment (other than ducts) and signs, whether by law deemed to be part of the really or not, installed at any time or times by Tenant or anyone *674 claiming under Tenant shall remain the property of Tenant or persons claiming under Tenant . . .
1962 Lease for 2058 Commonwealth Avenue at H13A. If the UST is not a trade fixture, a different, more favorable provision for the tenant will apply. Concerning the responsibilities of the landlord, the lease states in pertinent part:
The property which landlord is required to maintain is the foundation, the roof, the exterior walls, the structural beams and structural columns, and all utility conduits, fixtures and equipment of Landlord within the Shopping Center, which serve the demised premises in common with other premises [in the Shopping Center,] whether located inside or outside the demised premises. Landlord agrees that it will make all repairs to property Tenant is required to maintain if the same are made necessary by faulty materials or workmanship in the original construction.
1962 Lease for 2058 Commonwealth Avenue at H13A.

 The judge reserved this question for the jury: “Does the jury find by a fair preponderance of the evidence that the tower located on Pope’s Island was so annexed to the land owned by [the] Duchaine[s] that it became part of the land?”