### THE HERTZ CORPORATION and TSD Rental, LLC

v.

### ENTERPRISE RENT–A–CAR COMPANY and The Crawford Group, Inc.

**Civil Action No. 07–11793–RGS.**

United States District Court,
D. Massachusetts.

June 2, 2008.

---

J. Anthony Downs, Goodwin Procter, LLP, Lawrence K. Kolodney, Christopher R. Dillon, Fish & Richardson, PC, Boston, MA, for the Hertz Corporation and TSD Rental, LLC.

Michael P. Boudett, Catherine H. Wicker, Foley Hoag LLP, Boston, MA, Michael A. Kahn, Eric M. Lode, Beatrice B. Nguyen, Folger Levin & Kahn LLP, San Francisco, CA, for Enterprise Rent–a–Car Company and the Crawford Group, Inc.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS

STEARNS, District Judge.

### BACKGROUND

On February 19, 2007, plaintiffs The Hertz Corporation (Hertz) and TSD Rental LLC (TSD) filed a Complaint against competitors Enterprise Rent–a–Car Company (Enterprise) and The Crawford Group, Inc. (Crawford), asserting violations of Section 2 of the Sherman Antitrust Act (the Antitrust Complaint). The Antitrust Complaint took aim at a patent application filed by defendants in the United States Patent and Trademark Office (PTO)

in August of 2000.[1] Defendants countered with a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim. The court held a hearing on September 7, 2007, and rendered a preliminary opinion that plaintiffs had failed to raise a justiciable case or controversy.

Plaintiffs were then given leave to amend the Complaint. Less than one month later, on September 25, 2007, the PTO issued to Crawford as assignee United States Patent No. 7,275,038 (the '038 Patent), entitled "Web Enabled Business to Business Operating System For Rental Car Services." The same day, plaintiffs filed a separate action against defendants, seeking a declaratory judgment of invalidity, unenforceability, and non-infringement (the Patent Complaint).[2] On October 9, 2007, plaintiffs filed a "First Amended and Supplemental Complaint" seeking to cure the defects identified by the court in the original Antitrust Complaint. The court thereafter consolidated the two actions. Now before the court are defendants' motions to dismiss both Complaints in their entirety. A hearing on the motions was held on May 5, 2008.

1. *The Antitrust Complaint*

The Antitrust Complaint asserts statutory and common-law claims for violations of the Sherman Act, 15 U.S.C. § 2 (Count I);

unfair trade practices in contravention of the Massachusetts Consumer Protection Act, Gen. Laws Chapter 93A (Count II); and tortious interference with advantageous business relationships (Count III).[3] The fight is over EDiCAR, a software program licensed by Hertz from TSD, its creator. The EDiCAR program offers a method of tracking communications between rental car companies and insurers whose clients are provided replacement vehicles while their cars are being repaired. Enterprise has a patented software program of its own, the Automated Rental Management System (ARMS), that performs a similar task. Crawford is the owner of ARMS by virtue of its ownership of the '038 Patent. Although Enterprise formally licenses the right to use ARMS from Crawford, in reality the interests of the two defendants appear to be aligned.

The Antitrust Complaint alleges that defendants made false and misleading statements to the PTO in a (successful) effort to secure the '038 Patent and with it a monopoly over a choice and lucrative slice of the rental car market. More specifically, plaintiffs allege that Timothy Weinstock and William Tingle, Crawford employees who are also named inventors on the '038 Patent, signed false and misleading declarations to the PTO in an effort to evade the on-sale bar.[4] According to plaintiffs,

---

1. The PTO issued a Notice of Allowance in October of 2006.

2. The Patent Complaint was initially docketed by the Clerk's Office as having been filed on September 24, 2007. Plaintiffs filed a motion to correct the docket to reflect the fact that the case was not filed until the stroke of midnight on September 25, 2007. The court allowed the motion.

3. In amending the Antitrust Complaint, plaintiffs abandoned their previously asserted claims of violations of the Massachusetts Antitrust Act.

4. An invention is not patentable if it was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). The Supreme Court instructs that the on-sale bar applies when the invention, more than a year prior to the application date, is: (1) the subject of a commercial offer for sale; and (2) ready for patenting. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). The second element may be satisfied "by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other de-

on January 11, 2006, Weinstock signed a false declaration purporting to explain why several documents submitted by defendants to the PTO contained inconsistent dates. For example, a promotional document entitled "CIO Magazine 2002 Enterprise Value Awards Application" touted the fact that "ARMS/Web ... was piloted to the first users in July of 1999." This document, according to plaintiffs, makes clear that an ARMS system that embodied one or more of the claims of the '038 Patent had been placed in the market more than one year before the August 18, 2000 filing date of the patent application. According to the sworn declaration submitted by Weinstock to the PTO, the July 1999 date was in error and the first commercial deployment of ARMS did not occur until August 20, 1999.

Plaintiffs' argument is similar with respect to Tingle. On January 11, 2006, Tingle submitted a declaration explaining an article in the summer of 1999 edition of "Free Enterprise" announcing that "Enterprise is in the final stages of developing an Internet communications system that gives body shops a simple, electronic method for updating Enterprise Rental branches about the status of cars in their shop. Through a link with ARMS, it will also keep insurance companies up to date.... Currently, 40 repair shops are involved in the test phase of the [ARMS] system in four Enterprise groups. A nationwide rollout is set for this fall." Tingle declared that the article was incorrect, and that the "rollout" of ARMS did not occur until *after* August 20, 1999. Tingle also addressed a statement appearing in Value Awards, an-

other Enterprise publication, that "ARMS/Automotive was developed and deployed in April 1999." Tingle stated that the reference was to an entirely different system with the same name as ARMS.

Plaintiffs claim that in addition to Weinstock's and Tingle's perjurious submissions to the PTO, defendants made bad faith statements to insurers who were doing or considering doing business with Hertz. Although the original Complaint gave no factual content to these allegations, the Amended Antitrust Complaint asserts that in October and November of 2006, an Enterprise account representative told Geliene Heilman, an employee of GE Commercial Finance Fleet Services (a Hertz customer), that defendants would soon have a patent on ARMS that would put Hertz's EDiCAR system out of business. (Plaintiffs state upon information and belief that the account representative was Robert Pagliaro, an Enterprise National Sales Manager).

Plaintiffs allege that Pagliaro's statement caused Hertz to lose "potential business" with GE. Plaintiffs additionally allege (on information and belief) that one or more (unnamed) Enterprise representatives told Allstate Insurance (Allstate) that Hertz was or would be infringing the soon to be issued ARMS patent. Plaintiffs base this supposition on a Request for Quotation (RFQ) that Hertz received from Allstate in early 2007.[5] On February 5, 2007, after defendants received the Notice of Allowance, Allstate sent Hertz a list of questions with regard to the RFQ, including a request that Hertz "[p]rovide details

scriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* at 67–68, 119 S.Ct. 304.

**5.** Because Allstate spends approximately $230 million on insurance replacement rentals an-

nually, Hertz views Allstate as an important potential customer. Nothing is offered about the potential scale of business with GE, which does not immediately come to mind as a major presence in the rental car business.

about any pending or threatened lawsuit or any claim made against your company that alleges that products or services offered by or on behalf of [your] company—which will also be provided to Allstate should [your] company be a successful bidder pursuant to this RFQ—violate the intellectual property rights (patent, trademark, copyright, trade secret or other similar right) of another party." Plaintiffs claim that such a request is "unusual in this industry." Because Allstate was then under an exclusive contract with Enterprise, plaintiffs allege (again on information and belief) that Enterprise prompted Allstate to propound the question. Hertz informed Allstate that Enterprise had threatened it with litigation should a patent issue on the ARMS system. Thereafter, Allstate decided not to do business with Hertz. Plaintiffs state on information and belief that this was "at least in part as a result of Enterprise's false and bad faith assertions that Hertz was or would be infringing Enterprise's patent rights."

## DISCUSSION

Defendants contend that the court lacks subject matter jurisdiction because each of plaintiffs' claims requires proof of a fraud on the PTO. Defendants maintain that pursuant to *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), where a patent has yet to issue, the issue of fraud on the PTO is not justiciable. Defendants argue in the alternative that plaintiffs have failed to plead actionable claims with respect to all three counts of the Antitrust Complaint.

### A.   Jurisdiction

The essence of defendants' jurisdictional argument is that each cause of action set out in the Antitrust Complaint requires

the court to resolve issues pertaining to the '038 Patent's validity and enforceability. Such an analysis is impossible, defendants say, because the action was commenced before the '038 Patent issued. Defendants rely principally on *GAF Bldg. Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479 (Fed.Cir.1996). In that case, GAF, a competitor of Elk, brought an action for declaratory judgment, asserting that Elk's patent was invalid. The action was prompted by a cease and desist letter that Elk sent to GAF after it had received a Notice of Allowance from the PTO. The Federal Circuit affirmed the district court's determination that it lacked subject matter jurisdiction because the patent had not issued at the time the lawsuit was filed. The Circuit Court agreed that the complaint did not present a justiciable Article III case or controversy. It reasoned: "The district court did not know with certainty whether a patent would issue or, if so, what legal rights it would confer upon [defendant]. Thus, the dispute was purely hypothetical and called for an impermissible advisory opinion. Furthermore, the court could not have provided 'specific relief through a decree of a conclusive character,' since there was no issued patent for the court to declare 'invalid' or 'not infringed.'" *Id.* at 482 (internal citations omitted). Defendants liken this case to *GAF*, as the '038 Patent had not issued as of February 19, 2007, the day of the Antitrust Complaint's incarnation.

■ Plaintiffs argue at considerable length that despite the holdings of *GAF* and *Walker Process*, the claims asserted in the Antitrust Complaint can be evaluated independently of the '038 Patent. The gist of plaintiffs' argument is that the antitrust claims do not in any direct sense challenge the '038 Patent's validity. While this is true insofar as plaintiffs do not assert fraud on the PTO as an independent claim,

defendants quite accurately point out that the antitrust and common-law claims can only be decided by reference to the alleged fraudulent conduct. Consequently, the anticompetitive act allegations at the heart of the Antitrust Complaint, all of which predate the issuance of the '038 Patent, are, in defendants' view, nonjusticiable. *Cf. Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) ("The most superficial perusal of petitioners' complaint establishes, and no one disputes, that patent law did not in any sense create petitioners' antitrust or intentional-interference claims. Since no one asserts that federal jurisdiction rests on petitioners' state-law claims, the dispute centers around whether patent law 'is a necessary element of one of the well-pleaded [antitrust] claims.' ").[6]  In *Biotech. Indus. Org. v. Dist. of Columbia*, 496 F.3d 1362, 1367 (Fed.Cir.2007), a case brought by pharmaceutical and biotech trade associations challenging the constitutionality of a state law regulating drug pricing, the Federal Circuit observed that although "state tort law created the cause of action,[ ] the pleadings at issue required patent-law questions to be resolved.... [T]hough the plaintiffs' claim is created by principles of supremacy law, its resolution necessarily requires us to construe the patent statutes." [7]

Plaintiffs for their part argue that any jurisdictional defect in the original Complaint was cured by the filing of the "Amended and Supplemental" Antitrust Complaint on October 9, 2007 (two weeks after the '038 Patent issued).[8]  Defendants make the forceful counterargument that *GAF* teaches a conclusive rule that an amendment cannot cure a jurisdictional defect in a complaint. *See GAF*, 90 F.3d at 482 ("The fact that the patent was about to issue and would have been granted before the court reached the merits of the case is of no moment. Justiciability must be judged as of the time of filing, not as of some indeterminate future date when the court might reach the merits and the patent has issued."). *See also Struthers Scientific & Int'l Corp. v. Gen. Foods Corp.*, 334 F.Supp. 1329, 1332 (D.Del.1971) (defendant had not "obtained or been granted a patent as a result of its accused conduct so there cannot possibly be an 'enforcement' of an alleged fraudulent patent in an attempt to monopolize....").

This does not, however, end the analysis. As the First Circuit has explained, there is a subtle but significant difference between an "amendment" and a "supplement" to a complaint under Fed.R.Civ.P. 15.

There is an open question as to whether an amended complaint asserting a cause of action that arose only after the prior complaint was filed should be regarded as a "supplemental" rather than an "amended" complaint. The difference is

---

**6.** In that case, the Court ruled that "[t]he patent-law issue, while arguably necessary to at least one theory under each claim [brought under the Sherman Act], is not necessary to the overall success of either claim." *Id.* at 810, 108 S.Ct. 2166. Here, an affirmative analysis of patent law would seem indispensable to the success of plaintiffs' claims.

**7.** In another recently decided case, an alleged infringer sued the patentee claiming unfair competition under the Lanham Act, intentional interference with prospective economic advantage, and trade libel under California stat-

utory and common law. The patent holder had written to several of its customers giving notice that it had been accused of potential infringement and stating that it would not hesitate to take defensive legal action. The Federal Circuit held that "because [plaintiff's] claims arise out of [defendant's] communication of its patent rights, patent law is a necessary element of [plaintiff's] claims." *Dominant Semiconductors SDN.BHD. v. Osram GMBH*, 524 F.3d 1254, 1259 (Fed.Cir.2008).

**8.** Plaintiffs do not concede the existence of a defect in the original filing.

modest. An amended complaint filed pursuant to Federal Rule of Civil Procedure 15(a) typically relates to matters that have taken place prior to the date of the pleading that is being amended. A supplemental complaint typically allows the pleader to "set[ ] forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." Fed.R.Civ.P. 15(d). An amended complaint sometimes can be filed "as a matter of course," Fed.R.Civ.P. 15(a); a supplemental complaint cannot. *Connectu LLC v. Zuckerberg*, 522 F.3d 82, 90 (1st Cir.2008) (internal citation omitted). While the difference between an amendment and a supplement may be "modest," it can be of genuine consequence. Fed. R.Civ.P. 15(d) provides:

> [o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

■ The Rule is an extension of the Supreme Court's holding that a defect in a jurisdictional allegation must be cured by a supplemental pleading, rather than by an amendment. *Mathews v. Diaz*, 426 U.S. 67, 75, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). At the September 7, 2007 hearing, the court gave plaintiffs leave to amend the original Complaint. Plaintiffs took advantage of the opportunity by filing the "First Amended and Supplemental Complaint" on October 9, 2007. It incorporated a reference to the fact that the '038 Patent had issued, a "new occurrence, or event that happened" since the time the original Complaint was filed. Fed.R.Civ.P. 15(d). In the court's view, this new allegation should be viewed as a supplemental pleading accomplishing its intended purpose of healing a jurisdictional defect. *See Mathews*, 426 U.S. at 75, 96 S.Ct. 1883 ("A supplemental complaint in the District Court [eliminates] this jurisdictional issue.");[9] *Wilson v. Westinghouse Elec. Corp.*, 838 F.2d 286, 290 (8th Cir.1988) ("Even when the District Court lacks jurisdiction over a claim at the time of its original filing, a supplemental complaint may cure the defect by alleging the subsequent fact which eliminates the jurisdictional bar.").

The federal practice is to liberally allow supplemental pleadings. *See Camilla Cotton Oil Co. v. Spencer Kellogg & Sons, Inc.*, 257 F.2d 162, 167 (5th Cir.1958). *Cf. Bonner v. Elizabeth Arden, Inc.*, 177 F.2d 703, 705 (2d Cir.1949) (even under Rule 15(d), "the plaintiff cannot avoid the effect of lack of jurisdiction over the original action by alleging *a new cause of action* subsequently accruing because of later transactions, occurrences or event.") (Emphasis added). While Rule 15(d) is less permissive than Rule 15(a), a generous reading of Rule 15(d), at least in the early stages of litigation, is consistent with Rule 15(a)'s mandate that "[l]eave to amend is to be 'freely given' ... unless it would be futile, or reward, *inter alia*, undue or intended delay." *Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994) (citations omitted). *See also Steir v.*

---

**9.** In *Mathews*, the filing of an application for certain Medicare benefits was a nonwaivable statutory condition of jurisdiction. 426 U.S. at 75, 96 S.Ct. 1883. Although one plaintiff in the class action had not filed his application prior to suit, he did so while the case was pending in the District Court. *Id.*

*Girl Scouts of the USA,* 383 F.3d 7, 12 (1st Cir.2004).

## B. *The Antitrust Complaint*

### 1. *Sherman Act*

■ A plaintiff asserting a claim for a violation of Section 2 of the Sherman Act must show: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). *See also Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 230 (1st Cir.1983) (the second element requires a showing that defendant has acquired or maintained monopoly power by "improper means"). The First Circuit has given the second element the more descriptive label of "exclusionary conduct," which is defined as "conduct, other than competition on the merits or restraints reasonably necessary to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power." *Town of Concord v. Boston Edison Co.,* 915 F.2d 17, 21 (1st Cir.1990) (citation and internal quotation marks omitted).

■ There is no *per se* rule equating monopoly power with exclusionary conduct. "A practice is not 'anticompetitive' simply because it harms competitors. After all, almost all business activity, desirable and undesirable alike, seeks to advance a firm's fortunes at the expense of its competitors. Rather, a practice is 'anticompetitive' only if it harms the competitive process." *Id.* at 21. Suspicion, however, runs deep. Monopoly power is "the power to control prices or exclude competition," and the "existence of such power ordinarily may be inferred from the predominant share of the market." *Grinnell Corp.,* 384 U.S. at 571, 86 S.Ct. 1698. Here, the court accepts the undisputed allegation that defendants enjoy a dominant position in the relevant market(s), which plaintiffs define both narrowly as the insurance vehicle replacement business (of which Enterprise has an 80–85 percent share), and broadly as the off-airport U.S. rental car market (of which Enterprise has a 55 percent share).

The Supreme Court first recognized the fraudulent procurement of a patent as a viable basis for a Sherman Act claim in 1965 when it decided *Walker Process.* "We have concluded that the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present. In such event the treble damage provisions of § 4 of the Clayton Act would be available to an injured party." 382 U.S. at 174, 86 S.Ct. 347. Defendants argue that a *Walker Process* claim is the only antitrust theory that even remotely resembles the Sherman Act claim asserted by plaintiffs. They argue that plaintiffs cannot maintain a cause of action under *Walker Process* because an essential (and missing) element is "the *enforcement* of a patent procured by fraud on the patent office." *Id.* (emphasis added). Here defendants note that they have made no post-issuance attempt to enforce the '038 Patent.[10] Therefore, they argue that the *Walker Process* claim necessarily fails. According to defendants, any contrary result would raise the specter of judicial activism at its worst, injecting into antitrust law a heretical theory of

10. At the May 5, 2008 hearing, defendants' counsel was predictably evasive about any intention on defendants' part to bring a future enforcement action.

liability "contradict[ing] over 41 years of well-established authority."

■ While the court agrees with defendants that post-issuance conduct of a patentee must be the focus in analyzing a *Walker Process* claim, it does not share defendants' conviction that consideration of pre-issuance conduct is entirely irrelevant. The Federal Circuit has framed the issue as follows.

> Strictly speaking, a *Walker Process* claim is premised upon "the enforcement of a patent procured by fraud on the Patent Office." A plaintiff may bring a Declaratory Judgment Action of patent invalidity, however, even in the absence of overt enforcement actions. When the defendant's conduct, including its statements, falls short of an express charge, one must consider the "totality of the circumstances" in determining whether that conduct meets the first prong of the test [for jurisdiction to hear a Declaratory Judgment Action]. If the circumstances warrant, a reasonable apprehension may be found in the absence of any communication from defendant to plaintiff. If, on the other hand, defendant has done nothing but obtain a patent, there can be no basis for the required apprehension, a rule that protects quiescent patent owners against unwarranted litigation.

*Unitherm Food Sys., Inc. v. Swift–Eckrich, Inc.,* 375 F.3d 1341, 1357–1358 (Fed. Cir.2004), *rev'd on other grounds,* 546 U.S. 394, 126 S.Ct. 980, 163 L.Ed.2d 974 (2006). While a "defendant's conduct after the issuance of the patent should carry the far greater weight in [the court's] analysis than statements allegedly made months, if not years, prior even to the issuance of the patent," *Bonterra America, Inc. v. Bestmann,* 907 F.Supp. 4, 8 (D.D.C.1995), it is simply not credible that a defendant's pre-issuance conduct should be ignored. As plaintiffs argue, under defendants' exclusionary reading of *Walker Process,* a patent applicant would have a free hand to engage in the worst sorts of predatory conduct prior to the issuance of a patent without the least fear of liability under the antitrust laws.

■ Defendants next argue that even if plaintiffs can sustain a Sherman Act claim, the allegations of fraud on the PTO are insufficiently pled. It is undisputed that fraud-related claims arising in a patent context must be pled with the specificity required by Fed.R.Civ.P. 9(b). *See Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Solutions, P.C.,* 482 F.3d 1347, 1356–1357 (Fed.Cir.2007). Fed. R.Civ.P. 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind may be averred generally." *Id.* The court is satisfied that plaintiffs have met their burden under the heightened pleading requirements of Rule 9(b) by identifying Weinstock and Tingle by name, by specifying the allegedly perjurious documents that were submitted to the PTO, and by stating the basis for believing them to be false.

■ Defendants' final contention is that whatever the merits of Hertz's Sherman Act claim, TSD is neither a customer nor a competitor in the defined market(s) and therefore has no standing as a party. Defendants argue that TSD is simply a passive supplier of services to Hertz and not a true player in the market(s). As a rule, courts are reluctant to extend antitrust remedies to bystanders on the fringes of competition whose market injuries, if any, are largely a matter of speculation. *See In re Compact Disc Minimum Advertised Price Antitrust Litig.,* 456 F.Supp.2d 131, 146 (D.Me.2006); *SAS of P.R., Inc. v. P.R.*

*Tel. Co.,* 48 F.3d 39, 44 (1st Cir.1995). However, TSD does not appear in the pleadings as a flitting presence that "suffer[ed] because an antitrust violation curtail[ed] a business that would otherwise have purchased from [it as a] supplier." *Id.* TSD created and licensed to Hertz the technology that is at issue in this case. TSD provides the software to Hertz; its computers process Hertz's EDiCAR reservations; and it has a more than a passing stake in the outcome of the litigation. As plaintiffs aptly note, defendants have historically treated TSD as something other than a bit player in the unfolding drama, as evidenced by a June of 2002 letter threatening TSD with legal action in a prior dispute involving the ARMS system.

In sum, the court is satisfied that for purposes of the motion to dismiss the antitrust claims there is jurisdiction, the antitrust violations are sufficiently pled, and plaintiffs have standing.

### 2. *Tortious Interference with Advantageous Business Relations*

■ "[T]o make out a claim for interference with advantageous business relations, the plaintiff must prove that (1) he had a business relationship for economic benefit with a third party, (2) the defendants knew of the relationship, (3) the defendants interfered with the relationship through improper motive or means, and (4) the plaintiff's loss of advantage resulted directly from the defendants' conduct." *Kurker v. Hill,* 44 Mass.App.Ct. 184, 191, 689 N.E.2d

833 (1998). *See also Buster v. George W. Moore, Inc.,* 438 Mass. 635, 652, 783 N.E.2d 399 (2003) (viable claim based on an inducement to a third party not to enter a contract). "[S]omething more than intentional interference is required" to make out the tort. *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 815, 551 N.E.2d 20 (1990) (adopting *Restatement (Second) of Torts,* § 766 (1977)). The tort requires "actual malice" or "a spiteful, malignant purpose, unrelated to the legitimate corporate interest." *King v. Driscoll,* 418 Mass. 576, 587, 638 N.E.2d 488 (1994).

Defendants argue that plaintiffs' allegations regarding tortious interference suffer from a lack of specificity even under Rule 8(a)(2)'s permissive standard. *See Bell Atl. v. Twombly,* — U.S. —, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). Defendants note that plaintiffs do not allege that they sought and lost any specific contract opportunity with GE. Indeed, the only relevant fact alleged in the Complaint is that an opinion offered by Enterprise's Pagliaro to GE's Heilman (that an ARMS patent would destroy EDiCAR) dissuaded GE from doing business with Hertz.[11] With regard to Allstate, defendants state that plaintiffs have not alleged any facts to support the claim that a run-of-the-mill "due diligence" question was in any respect "unusual" or untoward.

The standard on a motion to dismiss is deferential, but a court need not sheer its moorings to common sense, particularly when highly inventive assertions are pled

---

**11.** Defendants speculate (not very usefully) about the myriad reasons that might explain why Hertz never won business from GE, including economic considerations and the availability of a presumably better technology from Hertz's competitors. Defendants also suggest that it may have been Hertz's own filings with the Securities Exchange Commission (which indicated that Enterprise "has asserted that certain systems we use to conduct insurance replacement rentals would infringe on patent rights it would obtain if it were granted certain patents for which it applied") that spoiled any relationship with GE. Plaintiffs offer little more by way of help on the subject. They suggest that the alienation of GE's affection resulted from an undefined "whispering campaign" waged by unnamed employees of defendants.

on information and belief. Dismissal for failure to state a claim is appropriate when the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Berner v. Delahanty*, 129 F.3d 20, 25 (1st Cir.1997), quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir.1988) (internal quotation marks omitted). *See also Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 17 (1st Cir.1998) (a court need not accept a complaint's "bald assertions" or "unsupportable conclusions").

■ What is glaringly absent from the Complaint is any supportable allegation that Pagliaro's statement was motivated by malice (as opposed to chauvinistic enthusiasm or excessive salesmanship). "The additional ingredient [to make out the tort] is improper conduct, which may include ulterior motive (e.g., wishing to do injury) or wrongful means (e.g. deceit or economic coercion)." *Schwanbeck v. Federal–Mogul Corp.*, 31 Mass.App.Ct. 390, 412, 578 N.E.2d 789 (1991), *rev'd on other grounds*, 412 Mass. 703, 592 N.E.2d 1289. *See Draghetti v. Chmielewski*, 416 Mass. 808, 816–817, 626 N.E.2d 862 (1994) (false accusation of impropriety motivated by retaliation and ill will).[12] *Compare Scosche Indus., Inc. v. Visor Gear, Inc.*, 121 F.3d 675, 679–680 (Fed.Cir.1997) (a patent applicant may properly inform existing or potential customers that a competitor will infringe the patent if and when it is issued).[13]

There is no plausible reason why this lamely-pled Count should be permitted to survive.

### 3. *Chapter 93A*

Defendants finally contend that the Chapter 93A claim cannot be sustained because plaintiffs do not allege that the anticompetitive effects of their actions were felt "primarily and predominantly" in the Commonwealth. Chapter 93A provides that

> [n]o action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice *occurred primarily and substantially* within the commonwealth.

Mass. Gen. Laws ch. 93A, § 11 (emphasis added). Defendants argue that the issue is not, as plaintiffs portray it, simply whether the offending conduct occurred "primarily and substantially" in Massachusetts, but also whether the anticompetitive effects were (or will be) felt "primarily and predominantly" *in situ*. Defendants rely on a second provision of section 11 stating that

> in any action brought under this section ... the court shall also be guided in its interpretation of the unfair methods of

---

**12.** Section 767 of the *Restatement (Second) of Torts* sets out additional factors that might be considered in determining whether a defendant's intentional interference with a contract (or a prospective contractual relation) should be deemed improper: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties."

**13.** The court is at a loss with respect to the allegations regarding Allstate. There is nothing offered other than conjecture connecting the question set out in Allstate's RFQ with defendants' conduct, much less anything of a factual nature suggesting that Allstate's decision (if there was one) not to do business with plaintiffs was occasioned by a malicious or improper act by defendants.

competition by [the Massachusetts Antitrust Act, Mass. Gen. Laws ch. 93, § 3]. *Id.* The Massachusetts Antitrust Act provides that none of its provisions

shall apply to any course of conduct, pattern of activity, or activities unless they occur and have their competitive impact *primarily and predominantly* within the commonwealth and at most, only incidentally outside New England.

Mass. Gen. Laws ch. 93, § 3 (emphasis added). The defendants have not cited, nor has the court located in its research, any case in which a Chapter 93A claim was dismissed for a failure to allege that anticompetitive effects were felt predominantly in Massachusetts.[14] The Supreme Judicial Court (SJC) has expressed

misgivings about the utility of a formula for analyzing all cases under § 11. Whether the 'actions and transactions [constituting the § 11 claim] occurred primarily and substantially within the commonwealth' is not a determination that can be reduced to any precise formula. Significant factors that can be identified for one case may be nonexistent in another. Any determination necessarily will be fact intensive and unique to each case.

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.,* 438 Mass. 459, 472, 781 N.E.2d 787 (2003). Because the Chapter 93A claim is an equitable matter reserved for the court, *see Acushnet Fed. Credit Union v. Roderick,* 26 Mass.App.Ct. 604, 606, 530 N.E.2d 1243 (1988), the prudent course is to revisit the adequacy of the pleadings after the factual development of the antitrust case.

### C. The Declaratory Judgment Complaint

On September 25, 2007, immediately after the '038 Patent issued, plaintiffs filed an action seeking a declaratory judgment of invalidity and noninfringement. In addition, plaintiffs reasserted the *Walker Process* claim for violation of section 2 of the Sherman Act. Defendants responded with a motion to dismiss the action on the previously trodden ground of lack of case or controversy.

### 1. Lack of Case or Controversy

Defendants make the argument that the declaratory action represents nothing more than an attempt by plaintiffs to win an "imagined race" to the courthouse. They argue (coyly or cautiously) that the action is premature because at the moment, they lack sufficient information to determine whether plaintiffs' EDiCAR system in fact infringes the '038 Patent. Defendants dismiss as "inconsequential" the two threats of litigation cited by plaintiffs as establishing jurisdiction: (1) a letter written by counsel for Enterprise to TSD in 2002; and (2) the allegations regarding defendants' contacts with GE and Allstate.

On June 21, 2002, counsel for Enterprise sent TSD a letter which stated in part.

We believe that you are also aware that Enterprise ... was first to market with its patent pending internet enabled

---

14. Defendants cite *Roche v. Royal Bank of Canada,* 109 F.3d 820 (1st Cir.1997), for the proposition that a defendant is exempt from liability if the *"anticompetitive effects* occurred primarily and substantially outside Massachusetts." The reliance on *Roche* is inapt. *Roche* dealt with a different issue: whether the *actionable conduct* in fact occurred in Massachusetts. *Id.* at 829 (The "question [is] whether the deception occurred primarily and substantially in Massachusetts.... [H]ere the burden is on *defendants* to show that their misconduct occurred primarily and substantially *outside* Massachusetts.") (Emphases supplied). Defendants do not allege that their conduct had no "substantial" relationship to the Commonwealth.

ARMS rental management system. . . . Enterprise views [TSD's] introduction of the Hertz EDiCAR System, and the services provided through it, to be an infringement of the intellectual property protecting the ARMS system. More particularly, it represents an infringement of the copyright Enterprise enjoys protecting the various screen [of the ARMS system] and their layouts, an infringement of the trademark and service mark rights represented by the secondary meaning that has attached to the ARMS system, and furthermore comprises unfair competition for these same reasons.

After receiving this letter, TSD brought suit against Enterprise in this court (which Hertz later joined) seeking a declaratory judgment that the EDiCAR system did not infringe any intellectual property rights held by Enterprise. On August 19, 2003, two weeks after Hertz joined the lawsuit, Enterprise filed an ARMS-related trademark action against Hertz in the Eastern District of Missouri.[15]

Defendants argue that the 2002 letter, which was over five years old when the Patent Complaint was filed, is stale and devoid of any assertion of patent rights.[16] Defendants also question the sufficiency of the alleged statements made to GE and Allstate by Pagliaro and unnamed others to establish the existence of a case or controversy. They note that Pagliaro as a Manager of National Marketing for Enterprise did not have the authority to speak on Enterprise's behalf regarding any potential patent enforcement action.[17] Plaintiffs, on the other hand, rely on the previous litigation (which in their view was invited by defendants) and the "whispering campaign" undertaken by defendants after the Notice of Allowance issued in late 2006. Plaintiffs argue that they would have been naive to expect anything from defendants other than renewed litigation to expand and enhance their ill-gotten monopoly.

■ "[T]he purpose of the Declaratory Judgment Act . . . in patent cases is to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights." *Goodyear Tire & Rubber Co. v. Releasomers, Inc.,* 824 F.2d 953, 956

---

15. The Missouri case was transferred and consolidated with the then pending Massachusetts litigation. The parties ultimately reached a settlement of the consolidated cases, and the court entered an Order on November 3, 2004, noting that "[i]t is *STIPU-LATED* by defendants Enterprise Rent–A–Car Company and The Crawford Group, Inc., that the Hertz EDiCAR System as it existed on June 21, 2002, did not infringe any of the defendants' then existing intellectual property rights, which did not include any patent rights, and that the use of the Hertz EDiCAR System as it existed at the time did not constitute unfair competition."

16. Defendants complain that because the initial salvo in the 2002 litigation was fired by plaintiffs, it is unfair to trot out the prior litigation as an affirmative act on defendants' part lending itself to the creation of jurisdiction in this case.

17. Defendants have attached declarations by Pagliaro and his supervisor, Bruce Clifton, to their Reply Brief. Pagliaro states that he does not recall making any comments to Heilman regarding the effects that a successful patent application might have on Hertz's ability to provide EDiCAR-related services. Clifton swears that when he learned of plaintiffs' allegations, he wrote to Heilman assuring her that Pagliaro did not have the authority to speak on behalf of Hertz. With regard to Allstate, Clifton avers that the due diligence question posed by Allstate is not at all unusual in the industry, and that defendants did nothing to prompt Allstate to ask the question. In fact, Clifton asserts that Allstate asked the same question in a similar RFQ that it sent to Enterprise. Because the case is at the Rule 12(b)(6) stage, the court has not relied on the declarations. *See Collier v. City of Chicopee,* 158 F.3d 601, 602 (1st Cir.1998).

(Fed.Cir.1987). As the Supreme Court has stated, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, ——, 127 S.Ct. 764, 771, 166 L.Ed.2d 604 (2007) (citation omitted). Prior to *MedImmune,* the Federal Circuit applied a more stringent two-pronged test to determine whether there was a "reasonable apprehension of suit" involving an assertion of patent rights. After that test was abrogated by the Supreme Court, the Federal Circuit summarized the new test as follows.

> Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do. We need not define the outer boundaries of declaratory judgment jurisdiction, which will depend on the application of the principles of declaratory judgment jurisdiction to the facts and circumstances of each case. We hold only that where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights.

*SanDisk Corp. v. STMicroelecs., Inc.*, 480 F.3d 1372, 1381 (Fed.Cir.2007). The Federal Circuit has remarked that "[w]hether intended or not, the now more lenient legal standard facilitates or enhances the availability of declaratory judgment jurisdiction in patent cases. The resulting ease of achieving declaratory judgment jurisdiction in patent cases is accompanied by unique challenges. For instance, the ease of obtaining a declaratory judgment could occasion a forum-seeking race to the courthouse between accused infringers and patent holders." *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 902 (Fed. Cir.2008) (internal citations omitted).

■■■ The court finds defendants' characterization of the import of the 2002 letter to border on the disingenuous: the letter did not assert patent rights because at the time it was written, defendants did not possess any patent rights. When the parties settled the first round of litigation, defendants insisted on a carve-out of patent rights from the settlement agreement, leaving the issue open for a future lawsuit. Under the flexible *MedImmune* standard, the court has no choice but to find that plaintiffs have sufficient grounds to bring a declaratory action. *Cf. Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,* 57 F.3d 1051, 1054 (Fed.Cir.1995) ("[T]he requirement that the declaratory plaintiff be under a reasonable apprehension of suit does not require that the patentee be known to be poised on the courthouse steps.").

### 2. *Failure to Plead with Specificity and/or Failure to State a Claim*

Defendants argue that the Patent Complaint does not allege sufficient facts supportive of the claims of invalidity and noninfringement. A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 127 S.Ct. at 1974. Defendants point out that at least two federal courts have now held that *Twombly*'s redefined pleading requirements apply to patent-based claims. (*Twombly* was an antitrust case). *See Bartronics, Inc. v. Power–One, Inc.*, 245

F.R.D. 532, 537 (S.D.Ala.2007); *Anticancer Inc. v. Xenogen Corp.*, 248 F.R.D. 278, 280 (S.D.Cal.2007). In the court's judgment, plaintiffs have sufficiently stated plausible claims of non-infringement and invalidity. They have identified the technology used by both parties and the alleged dissimilarities; they have identified the documents submitted by defendants to the PTO on which they rely to support the allegations that the '038 Patent is obvious and otherwise precluded by the on-sale bar. They might have done better, but for present purposes what they have done is enough.[18]

## ORDER

For the foregoing reasons, defendants' motion to dismiss the antitrust claims of the Antitrust Complaint is *DENIED.* The motion to dismiss the claims for tortious interference with advantageous business relations is *ALLOWED.* A ruling on the motion to dismiss the Chapter 93A claim is *RESERVED* pending completion of the trial of the jury claims. Defendants' motion to dismiss the Patent Complaint is *DENIED.* Counsel shall within fourteen (14) days of the date of this Order, submit a joint proposed discovery schedule for the court's approval on all outstanding matters.

In addition, within thirty (30) days of the date of this Order, Hertz and TSD shall serve and file their Preliminary Invalidity and Non–Infringement Contentions. Hertz and TSD shall identify with specificity the patent claims at issue. They shall then (if applicable) identify any prior art that anticipates or renders obvious these patent claims and shall, for each such prior

art reference, specify whether it anticipates or is relevant to the obviousness inquiry. Hertz and TSD shall additionally specify any other grounds supporting a claim of non-infringement, including claims limitations and/or application of the on-sale bar. Enterprise and Crawford shall serve and file their responses within thirty (30) days stating with specificity the claims and features of the EDiCAR system that they contend infringe the '038 Patent.

SO ORDERED.

---

18. As is its practice in patent cases, the court will issue an order requiring plaintiffs to specify in greater detail the grounds on which they believe that the EDiCAR system does not meet various limitations (for example, the database and sortable repair facility call back list requirements) of the independent claims of the '038 Patent. The court acknowledges plaintiffs' offer to amend the Complaint in this regard, but believes that its customary procedure is the more efficient approach.